**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Miguel R. Lopez,<br><br>                Plaintiff,<br>v.<br><br>The Bank of Missouri, Comenity Bank k/n/a Bread Financial Holdings, Synovus Bank, Celtic Bank, Applied Bank, First Premier Bank, Capital One Bank (USA) N.A., Mission Lane LLC d/b/a Mission Lane Card Services LLC, Fingerhut Companies, Webbank, LVNV Funding LLC, Resurgent Capital Services LP, and MRS BPO LLC,<br><br>                Defendants. | CIVIL ACTION NO.<br><br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

COMES NOW the Plaintiff, Miguel R. Lopez (hereinafter "Plaintiff"), and for his Complaint against the Defendants The Bank of Missouri, Comenity Bank k/n/a Bread Financial Holdings, Synovus Bank, Celtic Bank, Applied Bank, First Premier Bank, Capital One Bank (USA) N.A., Mission Lane LLC d/b/a Mission Lane Card Services LLC, Fingerhut Companies, Webbank, LVNV Funding LLC, Resurgent Capital Services LP, and MRS BPO LLC (Collectively "Defendants") states as follows:

**INTRODUCTION**

1.  This action arises out of Defendants' violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").

1

## JURISDICTION

2.  Jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681.

3.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff resides in the District, Plaintiff's transaction arose in the District, and Defendants conduct business in this District. <u>See</u> *Ford Motor Co. vs. Montana Eighth Judicial District Court*, 2021 WL 1132515 (U.S. March 25, 2021).

## PARTIES

4.  Plaintiff is a natural person residing in the City of Danbury, County of Fairfield, State of Connecticut, and is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

5.  Defendant The Bank of Missouri ("TBOM") is a bank organized under the laws of the United States of America. Defendant TBOM's principal place of business is located at 916 N Kings Highway St, Perryville, MO 63775. Defendant TBOM regularly does business in Connecticut. Defendant TBOM is a "person" as defined in 15 U.S.C. § 1681a(b); and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

6.  Defendant Comenity Bank k/n/a Bread Financial Holdings ("Comenity") is a specialized bank organized under the laws of the United States of America. Defendant Comenity's principal place of business is located at 3095 Loyalty Circle and Columbus, OH. Defendant Comenity regularly does business in Connecticut and has an agent of service in Connecticut located at CT Corporation System, 67 Burnside Ave

E, Hartford, CT 06108. Defendant Comenity is a "person" as defined in 15 U.S.C. § 1681a(b); and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

7. Defendant Synovus Bank ("Synovus") is a bank organized under the laws of the United States of America. Defendant Synovus' principal place of business is located at 1111 Bay Ave, Suite 501, Columbus, GA 31901. Defendant Synovus regularly does business in Connecticut and has an agent for service in Connecticut of Corporation Service Company, Goodwin Square, 225 Asylum St, 20th Floor, Hartford, CT 06103. Defendant Synovus is a "person" as defined in 15 U.S.C. § 1681a(b); and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

8. Defendant Celtic Bank ("Celtic") is a bank organized under the laws of the United States of America. Defendant Celtic has a principal place of business located at 268 S State Street, Suite 300, Salt Lake City, UT 84111. Defendant Celtic regularly does business in Connecticut. Defendant Celtic is a "person" as defined in 15 U.S.C. § 1681a(b); and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

9. Defendant Applied Bank ("Applied") is a bank organized under the laws of the United States of America. Defendant Applied's principal place of business is located at 2200 Concord Pike, Suite 102, Wilmington, DE 19803. Defendant Applied regularly does business in Connecticut. Defendant Applied is a "person" as defined in 15 U.S.C. § 1681a(b); and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

10.   Defendant First Premier Bank ("First Premier") is a bank organized under the laws of the United States of America. Defendant First Premier's principal place of business is located at 3820 N Louise Ave, Sioux Falls, SD 57107.  Defendant First Premier regularly does business in Connecticut.  Defendant First Premier is a "person" as defined in 15 U.S.C. § 1681a(b); and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

11.   Defendant Capital One Bank (USA) NA ("Capital One") is a foreign corporation incorporated under the laws of the state of Delaware.  Defendant Capital One is authorized to do business in the state of Connecticut; has a principal executive office located at 1680 Capital One Drive, McLean, Virginia 22102; and has a registered agent for service of 100 Shockoe Slip Fl 2, Richmond, VA 23219. Defendant Capital One regularly does business in Connecticut.  Defendant Capital One is a "person" as defined in 15 U.S.C. § 1681a(b); and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

12.   Defendant Continental Finance Company LLC ("Continental Finance") is a foreign corporation incorporated under the laws of the state of Delaware.  Defendant Continental Finance has a principal executive office located at 4550 Linden Hill Road, Suite 400, Wilmington, DE 19808. Defendant Continental Finance regularly does business in Connecticut.  Defendant Continental Finance is a "person" as defined in 15 U.S.C. § 1681a(b); and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

4

13.    Defendant Mission Lane LLC d/b/a Mission Lake Card Services LLC ("Mission Lane") is a foreign corporation incorporated under the laws of the state of Georgia. Defendant Mission Lane has a principal executive office located at 1504 Belleville St, Richmond, VA 23230; and has a registered agent for service of CT Corporation System, 3800 North Central Ave, Suite 460, Phoenix, AZ 85012. Defendant Mission Lane regularly does business in Connecticut.  Defendant Mission Lane is a "person" as defined in 15 U.S.C. § 1681a(b); and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

14.    Defendant Fingerhut Companies ("Fingerhut") is a corporation incorporated under the laws of the state of Minnesota.  Defendant Fingerhut has a principal executive office located at 6250 Ridgewood Rd, St. Cloud, MN 56303. Defendant Fingerhut regularly does business in Connecticut.  Defendant Fingerhut is a "person" as defined in 15 U.S.C. § 1681a(b); and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

15.    Defendant Webbank ("Webbank") is a bank organized under the laws of the United States of America. Defendant Webbank's principal place of business is located at 215 S State Street, Suite 1000, Salt Lake City, UT 84111, and has an agent of service of Corporation Service Company, 15 West South Temple, Suite 600, Salt Lake City, UT 84106.  Defendant Webbank regularly does business in Connecticut.  Defendant Webbank is a "person" as defined in 15 U.S.C. § 1681a(b); and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

16.     Defendant LVNV Funding LLC ("LVNV") is a collection agency with a principal place of business located at 55 Beattie Place, #110, Greenville, SC 29601. Defendant LVNV regularly does business in Connecticut and has an agent for service in Connecticut of Corporation Service Company, Goodwin Square, 225 Asylum St, 20th Floor, Hartford, CT 06103. Defendant LVNV is a "person" as defined in 15 U.S.C. § 1681a(b); and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

17.     Defendant Resurgent Capital Services LP ("Resurgent") is a collection agency with a principal place of business located at 55 Beattie Place, #110, Greenville, SC 29601. Defendant Resurgent regularly does business in Connecticut and has an agent for service in Connecticut of Corporation Service Company, Goodwin Square, 225 Asylum St, 20th Floor, Hartford, CT 06103. Defendant Resurgent is a "person" as defined in 15 U.S.C. § 1681a(b); and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

18.     Defendant MRS BPO LLC ("MRS BPO") is a corporation with a principal place of business located at 1930 Olney Ave, Cherry Hill, NJ 08003. Defendant MRS BPO regularly does business in Connecticut and has an agent for service in Connecticut of Cogency Global Inc., 29 W High Street, East Hampton, CT 06424. Defendant MRS BPO is a "person" as defined in 15 U.S.C. § 1681a(b); and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

## PURPOSE OF THE FAIR CREDIT REPORTING ACT

19.   Consumer credit plays a major role in the lives of American consumers entering the American marketplace and the economic system in general. Fair and accurate credit reporting acts as a gatekeeper to credit purchases, employment and income, basic commercial services, insurance coverage, housing rentals, and a broad range of other transactions. Robert J. Hobbs & Stephen Gardner, THE PRACTICE OF CONSUMER LAW 39-40 (2nd ed. 2006).

20.   Congress investigated and determined that the banking system is dependent upon fair and accurate reporting, that inaccurate credit reports directly impair the efficiency of the banking system, and that unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. 15 U.S.C. § 1681(a)(1).

21.   The FCRA was created to "ensure fair and accurate credit reporting, promote efficiency, and protect consumer privacy." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 52 (2007).

22.   The FCRA was proposed in 1968 as an amendment to the original Truth in Lending Act. Senator Proxmire (D-WI) announced his intention to create legislation addressing the growing frequency of cases in which a consumer "is unjustly denied because of *faults or incomplete information in a credit report*," and entered an initial draft of what would eventually become the FCRA into the Congressional Record. Anthony Rodriguez et al., FAIR CREDIT REPORTING 8 (5th ed. 2002) (citing 114 Cong. Rec. 24904 (Aug. 2, 1968)) (emphasis added).

23. Senator Proxmire listed five types of abuses requiring Congressional response, including biased or one-sided information and incomplete information. Anthony Rodriguez et al., FAIR CREDIT REPORTING 8 (5th ed. 2002) (citing 115 Cong. Rec. 2411 (Jan. 31, 1969)).

24. Congress considered inaccurate and misleading information to be the most serious problem. Anthony Rodriguez et al., FAIR CREDIT REPORTING 10 (5th ed. 2002).

25. The FCRA applies to situations in which information relevant to a consumer's "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" is collected. Anthony Rodriguez et al., FAIR CREDIT REPORTING 5 (5th ed. 2002) (citing 15 U.S.C. § 1681a(d)).

26. An inaccurate or misleading credit report can not only significantly and unfairly lower a consumer's credit worthiness but can also prevent consumers from full access to the American marketplace and negatively impact a consumer's living standard and general reputation on the whole if a consumer's character and mode of living is not accurately portrayed. Congress enacted the FCRA to prevent this arbitrary and iniquitous result.

27. Furthermore, in 1996, Congress, in an effort to increase the "accuracy and integrity" of information supplied to credit reporting agencies, added 15 U.S.C. § 1681s-2 to the FCRA by passing the Consumer Credit Reform Act. The provision, "[r]esponsibilities of furnishers of information to consumer reporting agencies," subjected data furnishers, who were not previously covered by the FCRA, to requirements related to accuracy and the handling of consumer disputes. These

8

provisions were originally scheduled to sunset in 2003 but were considered important enough to Congress to be made permanent in the Fair and Accurate Credit Transactions Act of 2003. Federal Trade Commission Staff: 40 Years of Experience with the Fair Credit Reporting Act, pp. 1, 2, 92. Retrieved from the FTC website: http://www.ftc.gov/os/2011/07/110720fcrareport.pdf.

28.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

29.    Consumer reporting agencies Equifax, Experian, Trans Union, and Innovis have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows data furnishers to create and respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

30.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II." It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

31.    Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

32.  Metro II codes are used on an industry wide form known within the credit industry as an Automated Credit Dispute Verification ("ACDV") electronic form.

33.  The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and credit reporting agencies.

34.  These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

<u>**FACTUAL ALLEGATIONS**</u>

**Processing of Credit Information**

35.  The national consumer reporting agencies (Trans Union, Equifax, and Experian) (collectively, the "CRAs") regularly receive information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors and others. These sources are known as "**furnishers**" within the credit reporting industry and under the FCRA.

36.  Defendants are furnishers of credit information about Plaintiff to each of the CRAs.

37.  The process by which CRAs receive, sort, and store information is largely electronic.

38.  Furnishers report credit information to the consumer reporting agencies electronically on a periodic basis using an electronic format known as Metro 2.

39.  The consumer reporting agencies take the credit information reported by these furnishers and create or associate consumer credit files.

40. Credit files are updated electronically by furnishers to reflect new information regarding the reported accounts (often referred to as **"tradelines"** within the industry).

41. When a furnisher wants to make a change to its reporting between reporting periods, a furnisher makes that change electronically using an electronic document known as an AUD or UDF (in some cases).

### Reinvestigation Procedures

42. When the CRAs receive a dispute from a consumer, the agencies investigate the dispute using an automated browser-based system called the Online Solution for Complete and Accurate Reporting (**"e-OSCAR"**). This system was designed to provide furnishers with an online solution for processing consumer disputes.

43. Through e-OSCAR, the CRAs send to the furnisher an Automated Credit Dispute Verification (**"ACDV"**) which is supposed to include: the information the agency is currently reporting about the consumer and the credit information being disputed along with all relevant information about the consumer's dispute which the agency received from the consumer.

44. Through this ACDV, the agency asks the furnisher to investigate the information in question and determine whether the information that it is reporting to the agency is correct, complete, and verifiable.

45. Through the ACDV, the furnisher is asked to verify that the indicative information (i.e. information such as name, current address, prior address, social security number, date of birth, and phone number) the CRA has on the consumer matches

the indicative information maintained in the furnisher's records; to verify that it is associated with the particular account being disputed; and to verify the accuracy of the tradeline information.

46. The furnisher is then supposed to return the ACDV to the CRA with the updated information (if any) relating to the consumer's credit history. In responding to an ACDV, a furnisher informs the agency that: (a) either the disputed information is "Verified"; (b) that the disputed information should be "Changed"; (c) or that the disputed item of information should be "Deleted. " To do this the furnisher is asked to do nothing more than check a box.

47. If a furnisher chooses to verify the information, it will check a box called "Verified As Reported." Once checked, this will instruct the consumer reporting agency that all information about the disputed item of information is, in fact, accurate and that no changes should be made.

48. If a furnisher chooses to change information, it will check a box called "Change Data As Shown" and then will input changes into the various fields of information that need to be changed.

49. Whenever a furnisher directs an agency to change information on a consumer's credit file, that furnisher affirms to the CRA that it has made the same changes in its own systems. This affirmation is made by the furnisher on the form used to process the dispute.

50. Sometime before 2012 Plaintiff was the victim of identity theft.

51. Then on or about May 16, 2012, Plaintiff received a telephone call from Union Savings Bank informing Plaintiff that two checks cashed in Plaintiff's name were returned for insufficient funds.

52. Plaintiff had no idea what the checks were for and was not the person attempting to cash said checks.

53. Plaintiff immediately put Union Savings Bank on notice that someone was trying to cash checks in Plaintiff's name without his knowledge or approval.

54. Plaintiff then filed a police report with the Bethel Police Department, Report #12-4566.

55. Plaintiff then filed another police report with the Bethel Police Department, Report #14-13483.

56. Plaintiff while dealing with the overwhelming amount of identity theft and accounts fraudulent accounts being opened in his name, was diligently disputing accounts on his credit reports.

57. The plaintiff noticed a fraudulent Verizon account on his credit profile.

58. Plaintiff attempted to get the Verizon account closed and off his profile. The national credit reporting agencies, Trans Union LLC ("TU") and Equifax Information Services LLC ("Equifax") deleted the fraudulent account, but Experian Information Solutions Inc. ("Experian") refused to remove it.

59. Wherefore, Plaintiff filed the police report 14-13483.

60.  Over the years Plaintiff has filed numerous disputes with the national credit reporting agencies attempting to rid himself of the fraudulent accounts appearing on his credit profile.

61.  Most recently after reviewing his reports in 2022 and 2023, Plaintiff sent numerous dispute letters detailing the numerous fraudulent accounts to various credits and the credit reporting agencies.

62.  Upon reviewing the reports, Plaintiff has discovered an abundance of fraudulent accounts on his reports and roughly $50,000 in outstanding debt that was not incurred by him or by using his credit without his knowledge or permission.

63.  Devastated, shocked, and confused, Plaintiff has been doing his own investigation on how this had happened and what steps were needed to rectify the issue.

64.  Absolutely heartbroken, Plaintiff has discovered that someone unbeknownst to Plaintiff, has stolen and used Plaintiff's personal identifying information to open a plethora of credit accounts in Plaintiff's name, including but not limited to credit card accounts, a telephone plan, automobile loans without his permission, authorization, or knowledge.

65.  Plaintiff has worked day and night to build a life for his family, Plaintiff's entire world, and the progress he has made has been flipped upside down.

66.  The plaintiff was bombarded with overwhelming feelings of sadness, helplessness, hopelessness, fear, anger, and extreme anxiety.

67. Being the fighter that he is, Plaintiff set aside these feelings for the good of his family and began, what he found out to be, a long, grueling, and immensely frustrating journey to fix his credit.

68. In his repeated disputes directly with Defendants and indirectly through the CRAs, neither the CRAs nor the Defendants believed his story refused to acknowledge the fraud, and failed to remove the accounts from his credit profile.

69. On May 31, 2023, Plaintiff submitted dispute letters to the national credit reporting agencies, Trans Union LLC ("TU"), Equifax Information Services LLC ("Equifax"), and Experian Information Solutions, Inc. ("Experian"), pursuant to 15 U.S.C. § 1681i, stating, in relevant part, that the accounts identified herein were the product of identity theft and fraudulently opened in Plaintiff's name, and that Defendants were misreporting that the accounts belonged to Plaintiff.

70. Plaintiff submitted his written dispute letter which included: each account that did not belong to him.

71. The credit reporting agencies identified above then communicated Plaintiff's thorough and robust disputes to Defendants in automated consumer dispute verification ("ACDV") forms, in apparent accordance with 15 U.S.C. § 1681i(a)(2).

**Facts Specific to Defendant TBOM**

72. Plaintiff's May 31, 2023, dispute specifically listed accounts with Defendant TBOM, bearing account numbers 405731042757XXXX, and 431732022103XXXX, as not belonging to Plaintiff.

73.   Upon information and belief, the CRAs communicated Plaintiff's dispute to Defendant TBOM in automated consumer dispute verification ("ACDV") forms and copies of the dispute correspondence pursuant to 15 U.S.C. § 1681i(a)(2).

74.   Defendant TBOM erroneously responded and verified to all three credit reporting agencies that the accounts belonged to Plaintiff.

75.   Defendant TBOM failed to conduct a reasonable investigation into Plaintiff's May 2023 dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account history, in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to the CRAs that the accounts were being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

76.   Plaintiff has suffered actual damages in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, and the weakening and diminishment of his credit profile, creditworthiness, debt-to-income ratio, and credit score, as a direct and proximate result of Defendant TBOM's violations of the Fair Credit Reporting Act as described above.

77.   Defendant TBOM's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

78.   Alternatively, Defendant TBOM's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

79. Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant TBOM in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

**Facts Specific to Defendant TBOM and Defendant Continental Finance**

80. Plaintiff's May 31, 2023, dispute specifically listed accounts with Defendant TBOM / Defendant Continental Finance, bearing account number 516648860245XXXX, as not belonging to Plaintiff.

81. Upon information and belief, the CRAs communicated Plaintiff's dispute to Defendant TBOM and Defendant Continental Finance in automated consumer dispute verification ("ACDV") forms and copies of the dispute correspondence pursuant to 15 U.S.C. § 1681i(a)(2).

82. Defendant TBOM and Defendant Continental Finance erroneously responded and verified to all three credit reporting agencies that the account belonged to Plaintiff.

83. Defendant TBOM and Defendant Continental Finance failed to conduct a reasonable investigation into Plaintiff's May 2023 dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account history, in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to the CRAs that the accounts were being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

84. Plaintiff has suffered actual damages in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, and the weakening and diminishment of his credit profile, creditworthiness, debt-to-income ratio, and credit score, as a direct and proximate result of Defendant TBOM and Defendant Continental Finance's violations of the Fair Credit Reporting Act as described above.

85.  Defendant TBOM and Defendant Continental Finance's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

86.  Alternatively, Defendant TBOM and Defendant Continental Finance's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

87.  Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant TBOM and Defendant Continental Finance in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

**Facts Specific to Defendant Comenity**

88.  Plaintiff's May 31, 2023, dispute specifically listed accounts with Defendant Comenity, bearing account numbers 402241100338XXXX and 578098103764XXXX, as not belonging to Plaintiff.

89.  Upon information and belief, the CRAs communicated Plaintiff's dispute to Defendant Comenity in automated consumer dispute verification ("ACDV") forms and copies of the dispute correspondence pursuant to 15 U.S.C. § 1681i(a)(2).

90.  Defendant Comenity erroneously responded and verified to all three credit reporting agencies that the accounts belonged to Plaintiff.

91.  Defendant Comenity failed to conduct a reasonable investigation into Plaintiff's May 2023 dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account history, in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code)

to "XB," and, instead, incorrectly verified to the CRAs that the accounts were being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

92.   Plaintiff has suffered actual damages in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, and the weakening and diminishment of his credit profile, creditworthiness, debt-to-income ratio, and credit score, as a direct and proximate result of Defendant Comenity's violations of the Fair Credit Reporting Act as described above.

93.   Defendant Comenity's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

94.   Alternatively, Defendant Comenity's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

95.   Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant Comenity in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

### Facts Specific to Defendant Synovus

96.   Plaintiff's May 31, 2023, dispute specifically listed accounts with Defendant Synovus, bearing account number ending in 526449020182, as not belonging to Plaintiff.

97.   Upon information and belief, the CRAs communicated Plaintiff's dispute to Defendant Synovus in automated consumer dispute verification ("ACDV") forms and copies of the dispute correspondence pursuant to 15 U.S.C. § 1681i(a)(2).

98. Defendant Synovus erroneously responded and verified to all three credit reporting agencies that the account belonged to Plaintiff.

99. Defendant Synovus failed to conduct a reasonable investigation into Plaintiff's May 2023 dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account history, in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to the CRAs that the accounts were being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

100. Plaintiff has suffered actual damages in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, and the weakening and diminishment of his credit profile, creditworthiness, debt-to-income ratio, and credit score, as a direct and proximate result of Defendant Synovus' violations of the Fair Credit Reporting Act as described above.

101. Defendant Synovus' conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

102. Alternatively, Defendant Synovus' violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

103. Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant Synovus in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

**Facts Specific to Defendant Celtic and Defendant Continental Finance**

104.  Plaintiff's May 31, 2023, dispute specifically listed accounts with Defendant Celtic / Defendant Continental Finance, bearing account number 534636021159XXXX, as not belonging to Plaintiff.

105.  Upon information and belief, the CRAs communicated Plaintiff's dispute to Defendant Celtic and Defendant Continental Finance in automated consumer dispute verification ("ACDV") forms and copies of the dispute correspondence pursuant to 15 U.S.C. § 1681i(a)(2).

106.  Defendant Celtic and Defendant Continental Finance erroneously responded and verified to all three credit reporting agencies that the account belonged to Plaintiff.

107.  Defendant Celtic and Defendant Continental Finance failed to conduct a reasonable investigation into Plaintiff's May 2023 dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account history, in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to the CRAs that the accounts were being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

108.  Plaintiff has suffered actual damages in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, and the weakening and diminishment of his credit profile, creditworthiness, debt-to-income ratio, and credit score, as a direct and proximate result of Defendant Celtic and Defendant Continental Finance's violations of the Fair Credit Reporting Act as described above.

109. Defendant Celtic and Defendant Continental Finance's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

110. Alternatively, Defendant Celtic and Defendant Continental Finance's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

111. Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant Celtic and Defendant Continental Finance in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

**Facts Specific to Defendant Applied**

112. Plaintiff's May 31, 2023, dispute specifically listed accounts with Defendant Applied, bearing account number 422709316386XXXX, as not belonging to Plaintiff.

113. Upon information and belief, the CRAs communicated Plaintiff's dispute to Defendant Applied in automated consumer dispute verification ("ACDV") forms and copies of the dispute correspondence pursuant to 15 U.S.C. § 1681i(a)(2).

114. Defendant Applied erroneously responded and verified to all three credit reporting agencies that the account belonged to Plaintiff.

115. Defendant Applied failed to conduct a reasonable investigation into Plaintiff's May 2023 dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account history, in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code)

to "XB," and, instead, incorrectly verified to the CRAs that the account was being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

116.    Plaintiff has suffered actual damages in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, and the weakening and diminishment of his credit profile, creditworthiness, debt-to-income ratio, and credit score, as a direct and proximate result of Defendant Applied's violations of the Fair Credit Reporting Act as described above.

117.    Defendant Applied's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

118.    Alternatively, Defendant Applied's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

119.    Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant Applied in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

**Facts Specific to Defendant First Premier**

120.    Plaintiff's May 31, 2023, dispute specifically listed accounts with Defendant First Premier, bearing account number 517800688761XXXX, as not belonging to Plaintiff.

121.    Upon information and belief, the CRAs communicated Plaintiff's dispute to Defendant First Premier in automated consumer dispute verification ("ACDV") forms and copies of the dispute correspondence pursuant to 15 U.S.C. § 1681i(a)(2).

24

122.  Defendant First Premier erroneously responded and verified to all three credit reporting agencies that the account belonged to Plaintiff.

123.  Defendant First Premier failed to conduct a reasonable investigation into Plaintiff's May 2023 dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account history, in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to the CRAs that the account was being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

124.   Plaintiff has suffered actual damages in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, and the weakening and diminishment of his credit profile, creditworthiness, debt-to-income ratio, and credit score, as a direct and proximate result of Defendant First Premier's violations of the Fair Credit Reporting Act as described above.

125.  Defendant First Premier's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

126.  Alternatively, Defendant First Premier's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

127.  Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant First Premier in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

**Facts Specific to Defendant Capital One**

128. Plaintiff's May 31, 2023, dispute specifically listed accounts with Defendant Capital One, bearing account number 54895519177XXXX, as not belonging to Plaintiff.

129. Upon information and belief, the CRAs communicated Plaintiff's dispute to Defendant Capital One in automated consumer dispute verification ("ACDV") forms and copies of the dispute correspondence pursuant to 15 U.S.C. § 1681i(a)(2).

130. Defendant Capital One erroneously responded and verified to all three credit reporting agencies that the account belonged to Plaintiff.

131. Defendant Capital One failed to conduct a reasonable investigation into Plaintiff's May 2023 dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account history, in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to the CRAs that the account was being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

132. Plaintiff has suffered actual damages in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, and the weakening and diminishment of his credit profile, creditworthiness, debt-to-income ratio, and credit score, as a direct and proximate result of Defendant Capital One's violations of the Fair Credit Reporting Act as described above.

133. Defendant Capital One's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

134. Alternatively, Defendant Capital One's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

135. Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant Capital One in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

## Facts Specific to Defendant Mission Lane

136. Plaintiff's May 31, 2023, dispute specifically listed accounts with Defendant Mission Lane, bearing account number 431503018766XXXX, as not belonging to Plaintiff.

137. Upon information and belief, the CRAs communicated Plaintiff's dispute to Defendant Mission Lane in automated consumer dispute verification ("ACDV") forms and copies of the dispute correspondence pursuant to 15 U.S.C. § 1681i(a)(2).

138. Defendant Mission Lane erroneously responded and verified to all three credit reporting agencies that the account belonged to Plaintiff.

139. Defendant Mission Lane failed to conduct a reasonable investigation into Plaintiff's May 2023 dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account history, in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to the CRAs that the account was being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

140. Plaintiff has suffered actual damages in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, and the weakening and diminishment of his

27

credit profile, creditworthiness, debt-to-income ratio, and credit score, as a direct and proximate result of Defendant Mission Lane's violations of the Fair Credit Reporting Act as described above.

141. Defendant Mission Lane's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

142. Alternatively, Defendant Mission Lane's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

143. Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant Mission Lane in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

**Facts Specific to Defendant Webbank / Defendant Fingerhut**

144. Plaintiff's May 31, 2023, dispute specifically listed accounts with Defendant Webbank and Defendant Fingerhut, bearing account numbers 636992108152XXXX and 636992400830XXXX, as not belonging to Plaintiff.

145. Upon information and belief, the CRAs communicated Plaintiff's dispute to Defendant Webbank and Defendant Fingerhut in automated consumer dispute verification ("ACDV") forms and copies of the dispute correspondence pursuant to 15 U.S.C. § 1681i(a)(2).

146. Defendant Defendant Webbank and Defendant Fingerhut erroneously responded and verified to all three credit reporting agencies that the accounts belonged to Plaintiff.

147.    Defendant Webbank and Defendant Fingerhut failed to conduct a reasonable investigation into Plaintiff's May 2023 dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account history, in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to the CRAs that the accounts were being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

148.    Plaintiff has suffered actual damages in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, and the weakening and diminishment of his credit profile, creditworthiness, debt-to-income ratio, and credit score, as a direct and proximate result of Defendant Webbank and Defendant Fingerhut's violations of the Fair Credit Reporting Act as described above.

149.    Defendant Webbank and Defendant Fingerhut's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

150.    Alternatively, Defendant Webbank and Defendant Fingerhut's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

151.    Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant Webbank and Defendant Fingerhut in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

**Facts Specific to Defendant LVNV Funding / Resurgent Capital**

152. Plaintiff's May 31, 2023, dispute specifically listed accounts with Defendant LVNV Funding and Defendant Resurgent Capital, bearing account numbers 431732022103XXXX, 5264949020182XXXX, XXXXXXXX9513, and 636992400830XXXX, as not belonging to Plaintiff.

153. Upon information and belief, the CRAs communicated Plaintiff's dispute to Defendant LVNV Funding and Defendant Resurgent Capital in automated consumer dispute verification ("ACDV") forms and copies of the dispute correspondence pursuant to 15 U.S.C. § 1681i(a)(2).

154. Defendant LVNV Funding and Defendant Resurgent Capital erroneously responded and verified to all three credit reporting agencies that the accounts belonged to Plaintiff.

155. Defendant LVNV Funding and Defendant Resurgent Capital failed to conduct a reasonable investigation into Plaintiff's May 2023 dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account history, in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to the CRAs that the accounts were being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

156. Plaintiff has suffered actual damages in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, and the weakening and diminishment of his credit profile, creditworthiness, debt-to-income ratio, and credit score, as a direct and

proximate result of Defendant LVNV Funding and Defendant Resurgent Capital's violations of the Fair Credit Reporting Act as described above.

157. Defendant LVNV Funding and Defendant Resurgent Capital's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

158. Alternatively, Defendant LVNV Funding and Defendant Resurgent Capital's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

159. Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant LVNV Funding and Defendant Resurgent Capital in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

### Facts Specific to Defendant MRS BPO

160. Plaintiff's May 31, 2023, dispute specifically listed accounts with Defendant MRS BPO, bearing account number LU8XX1935578, as not belonging to Plaintiff.

161. Upon information and belief, the CRAs communicated Plaintiff's dispute to Defendant MRS BPO in automated consumer dispute verification ("ACDV") forms and copies of the dispute correspondence pursuant to 15 U.S.C. § 1681i(a)(2).

162. Defendant Mission Lane erroneously responded and verified to all three credit reporting agencies that the account belonged to Plaintiff.

163. Defendant MRS BPO failed to conduct a reasonable investigation into Plaintiff's May 2023 dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account history, in the alternative, to report the

account as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to the CRAs that the account was being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

164.  Plaintiff has suffered actual damages in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, and the weakening and diminishment of his credit profile, creditworthiness, debt-to-income ratio, and credit score, as a direct and proximate result of Defendant MRS BPO's violations of the Fair Credit Reporting Act as described above.

165.  Defendant MRS BPO's conduct, actions, and inactions were willful, rendering it liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

166.  Alternatively, Defendant MRS BPO's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

167.  Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant MRS BPO in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

## PLAINTIFF'S DAMAGES

168.  As a result of Defendants' inaccurate furnishing/reporting, Plaintiff has suffered reduced credit score and profile, has impaired his ability to obtain credit or to obtain it on favorable terms, great amount of emotional distress, frustration, anxiety, and many hours of his time disputing / research / the fraudulent inaccurate reporting by

the Defendants, constituting actual damages pursuant to 15 U.S.C. § 1681o(a)(1) and § 1681n.

169. Plaintiff is entitled to attorney's fees and costs from each Defendant pursuant to 15 U.S.C. § 1681o(a)(2) and § 1681n.

## RESPONDEAT SUPERIOR LIABILITY

170. The acts and omissions of employees and other agents of Defendants who communicated with Plaintiff and/or with the CRAs were committed within the time and space limits of their agency relationship with their principal, Defendants.

171. The acts and omissions by these agents were incidental to, or of the same general nature as, the responsibilities these agents were authorized to perform by Defendants.

172. By committing these acts and omissions against Plaintiff, these agents were motivated to benefit their principal, Defendants.

173. Defendants is/are therefore liable to Plaintiff through the Doctrine of Respondeat Superior for the intentional and negligent acts, errors, and omissions done in violation of federal law by its agents, including but not limited to violations of the FCRA.

## STANDING

174. Standing is proper under Article III of the Constitution of the United States of America because Plaintiff's claims state:

   a. a valid injury in fact;

   b. which is traceable to the conduct of Defendants;

c. and is likely to be redressed by a favorable judicial decision.

*See Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016), and *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).

175.   In order to meet the standard laid out in *Spokeo* and *Lujan,* Plaintiff must clearly allege facts demonstrating all three prongs above.

*The "Injury in Fact" Prong*

176.   Plaintiff's injury in fact must be both "concrete" and "particularized" in order to satisfy the requirements of Article III of the Constitution, as laid out in *Spokeo. Id.*

177.   For an injury to be "concrete" it must be a *de facto* injury, meaning that it actually exists.   In the present case, Defendants' actions negatively impacted Plaintiff's credit.

178.   For an injury to be "particularized" means that the injury must "affect the plaintiff in a personal and individual way." *Spokeo,* 136 S. Ct. at 1548.   In the instant case, Plaintiff personally suffered worse credit and emotional distress.

*The "Traceable to the Conduct of Defendants" Prong*

179.   The second prong required to establish standing at the pleadings phase is that Plaintiff must allege facts to show that Plaintiff's injury is traceable to the conduct of Defendants.

180.   In the instant case, this prong is met simply by the facts that the violative conduct contemplated in this Complaint was initiated by Defendants directly, or by Defendants' agents at the direction of Defendants.

*The "Injury is Likely to be Redressed by a Favorable Judicial Opinion" Prong*

181.   The third prong to establish standing at the pleadings phase requires Plaintiff to allege facts to show that the injury is likely to be redressed by a favorable judicial opinion.

182.   In the present case, Plaintiff's Prayers for Relief include a request for statutory and actual damages. The damages were set by Congress and specifically redress the financial damages suffered by Plaintiff.

183.   Furthermore, the award of monetary damages redress the injuries of the past, and prevent further injury by Defendants in the future.

184.   Because all standing requirements of Article III of the U.S. Constitution have been met, as laid out in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), Plaintiff has standing to sue Defendants on the stated claims.

## CAUSE OF ACTION

### COUNT I.

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT – 15 U.S.C. § 1681 *et seq.*

140.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

141.   Defendants violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it and documentation provided by Plaintiff, and failing to update and/or remove the inaccurate tradeline or, in the alternative, to report the

account as "disputed" by changing the Metro II CCC (Compliance Condition Codes) Code to "XB."

142.    As a result of Defendants' violations of the FCRA, Plaintiff has suffered actual damages not limited to detriment to her credit rating, emotional distress, embarrassment, mental anguish, and anxiety in an amount to be determined at trial.

143.    Defendants' conduct, actions, and inactions were willful, rendering them liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

144.    Alternatively, Defendants' violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

145.    Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from each Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that judgment be entered against Defendants for:

- an award of actual and statutory damages against Defendants for violations of the FCRA pursuant to 15 U.S.C. §§ 1681n and 1681o;
- an award of punitive damages against Defendants for willful noncompliance with the FCRA pursuant to 15 U.S.C. § 1681n;
- an award of costs and attorney's fees against Defendants pursuant to 15 U.S.C. §§ 1681n and 1681o; and
- such other and further relief as the Court may deem just and proper.

Dated this 28 day of November 2023.

Respectfully submitted

PLAINTIFF
MIGUEL R. LOPEZ
BY AND THROUGH COUNSEL


s/ Jennifer LaRese
Jennifer LaRese, Esq.
Law Offices of Jennifer LaRese, LLC
33 Bullet Hill Rd
Southbury, CT 06488
P: 203.556.9709
F: 203.828.6330
jennifer@LaReseLawOffice.com
Ct27913

## VERIFICATION OF COMPLAINT AND CERTIFICATION BY PLAINTIFF

I, Miquel R. Lopez, declare under penalty of perjury, as provided for by the laws of

the United States, 28 U.S.C. § 1746, that the following statements are true and correct:

1. I am the Plaintiff in this civil proceeding.
2. I have read the above-entitled civil Complaint prepared by my attorneys and I believe that all the facts contained in it are true, to the best of my knowledge, information, and belief, formed after reasonable inquiry.
3. I believe that this civil Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.
4. I believe that this civil Complaint is not interposed for any improper purpose, such as to harass any Defendant(s), cause unnecessary delay to any Defendant(s), or create a needless increase in the cost of litigation to any Defendant(s), named in the Complaint.
5. I have filed this civil Complaint in good faith and solely for the purposes set forth in it.

Dated this 5 day of ~~October~~ 2023.
Nov

Miquel R. Lopez

38